

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00516-CV

Heriberto D. **GONZALEZ**,
Appellant

v.

Salvador **JOHNSON**, Sr. and Amy Marshall,
Appellees

From the County Court at Law No. 2, Webb County, Texas
Trial Court No. 2019CVH002459C3
Honorable Victor Villarreal, Judge Presiding

Opinion by:   Liza A. Rodriguez, Justice

Sitting:   Luz Elena D. Chapa, Justice
Liza A. Rodriguez, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: October 27, 2021

REVERSED AND RENDERED

Heriberto D. Gonzalez, the superintendent of Webb County Independent School District

("WCISD"), appeals from the trial court's order denying his motion for summary judgment on the

basis of the professional immunity defense pursuant to section 22.0511 of the Texas Education

Code.[1] We reverse and render.

---

[1] Appellees did not file a brief.

**BACKGROUND**

In the underlying cause, Appellees Salvador Johnson, Sr. and Amy Marshall sued Gonzalez for breach of an oral contract and promissory estoppel. They alleged that Gonzalez "represented and agreed with Plaintiffs that [Gonzalez] would contribute the amount of up to ten thousand ($10,000.00) dollars for the purchase of animals raised by agricultural students to be sold at the L.I.F.E.[2] auction." Appellees further alleged that Gonzalez "authorized [them] to purchase such animals as [they] should determine to the extent of ten thousand ($10,000.00) on [Gonzalez]'s behalf." "In reliance upon [Gonzalez]'s representations and agreement," Johnson "purchased animals at the auction held on March 3, 2019, on behalf of [Gonzalez] to the extent of" $10,476.44. Appellees alleged that Gonzalez "failed and refused to pay L.I.F.E. the agreed upon amount." Thus, appellees alleged that Gonzalez breached his oral agreement with them "to contribute the agreed upon amount towards the purchase price of the animals," and appellees "were required to pay said amount to L.I.F.E. out of their own funds."

Appellees further alleged in the alternative that Gonzalez was liable on the basis of promissory estoppel. They alleged Gonzalez made a promise to them upon which they reasonably and substantially relied. Appellees acknowledged that Gonzalez is the superintendent of WCISD but alleged that "at all relevant times" they were dealing with Gonzalez "solely in his individual capacity" and did "not in any way seek to implicate and/or recover from WCISD by way of [the lawsuit]."

In response to the lawsuit, Gonzalez filed a traditional motion for summary judgment asserting the statutory defense of professional immunity as set out in section 22.0511 of the Texas Education Code, arguing that appellees were suing him for actions "incident to or within the scope

---

[2] L.I.F.E. stands for the Laredo International Fair and Exposition.

of his duties" as superintendent. After considering Gonzalez's motion and the appellees' response, the trial court denied the motion for summary judgment. Gonzalez then filed this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(5) (interlocutory appeal permitted from an order that "denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state").

### DISCUSSION

In filing a traditional motion for summary judgment asserting the statutory defense of professional immunity, Gonzalez had the burden to show that no genuine issue of material fact exists and that he was entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *see* TEX. R. CIV. P. 166a(c). The professional immunity defense pursuant to section 22.0511 of the Texas Education Code provides that a

> professional employee of a school district is not personally liable for any act that is *incident to or within the scope of the duties* of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

TEX. EDUC. CODE § 22.0511(a) (emphasis added). Section 22.051 specifically states that a superintendent is included within the term "professional employee of a school district." *Id*. § 22.051(a)(1). "Whether one is acting within the scope of his employment depends upon whether the general act from which injury arose was in furtherance of the employer's business and for the accomplishment of the object for which the employee was employed." *Chesshir v. Sharp*, 19 S.W.3d 502, 505 (Tex. App.—Amarillo 2000, no pet.). Thus, the issue is whether appellees' allegations are incident to or within the scope of a superintendent's duties.

A superintendent's duties, as set out in the Education Code, include the following:

(1) assuming administrative responsibility and leadership for the planning, organization, operation, supervision, and evaluation of the education programs, services, and facilities of the district and for the annual performance appraisal of the district's staff;

(2) except as provided by Section 11.202, assuming administrative authority and responsibility for the assignment, supervision, and evaluation of all personnel of the district other than the superintendent;

(3) overseeing compliance with the standards for school facilities established by the commissioner under Section 46.008;

(4) initiating the termination or suspension of an employee or the nonrenewal of an employee's term contract;

(5) managing the day-to-day operations of the district as its administrative manager, including implementing and monitoring plans, procedures, programs, and systems to achieve clearly defined and desired results in major areas of district operations;

(6) preparing and submitting to the board of trustees a proposed budget as provided by Section 44.002 and rules adopted under that section, and administering the budget;

(7) preparing recommendations for policies to be adopted by the board of trustees and overseeing the implementation of adopted policies;

(8) developing or causing to be developed appropriate administrative regulations to implement policies established by the board of trustees;

(9) providing leadership for the attainment and, if necessary, improvement of student performance in the district based on the indicators adopted under Sections 39.053 and 39.301 and other indicators adopted by the commissioner or the district's board of trustees;

(10) organizing the district's central administration;

(11) consulting with the district-level committee as required under Section 11.252(f);

(12) ensuring:
(A) adoption of a student code of conduct as required under Section 37.001 and enforcement of that code of conduct; and
(B) adoption and enforcement of other student disciplinary rules and procedures as necessary;

(13) submitting reports as required by state or federal law, rule, or regulation, and ensuring that a copy of any report required

by federal law, rule, or regulation is also delivered to the agency;

(14)    providing joint leadership with the board of trustees to ensure that the responsibilities of the board and superintendent team are carried out; and

(15)    performing any other duties assigned by action of the board of trustees.

TEX. EDUC. CODE § 11.201. Together, a board and superintendent shall:

1. Advocate for the high achievement of all district students;
2. *Create and support connections with community organizations to provide community-wide support for the high achievement of all district students*;
3. Provide educational leadership for a district, including leadership in developing the district vision statement and long-range educational plan;
4. Establish district-wide policies and annual goals that are tied directly to the district's vision statement and long-range educational plan;
5. Support the professional development of principals, teachers, and other staff; and
6. Periodically evaluate board and superintendent leadership, governance, and teamwork.

*Id*. § 11.1512(b) (emphasis added).

In addition to these vast statutory duties, the WCISD Board Policy Manual is publicly available and assigns ten additional duties under "Educational Leadership";[3] fourteen additional

---

[3] To provide leadership and direction for the development of an educational system that is based on the needs of students, on standards of excellence and equity, and on community goals, the Superintendent shall:

1. Establish effective mechanisms for communication to and from staff in instructional evaluation, planning, and decision making.
2. Oversee annual planning for instructional improvement and monitor for effectiveness.
3. Ensure that goals and objectives form the basis of curricular decision making and instruction and communicate expectations for high achievement.
4. Ensure that appropriate data are used in developing recommendations and making decisions regarding the instructional program and resources.
5. Oversee a system for regular evaluation of instructional programs, including identifying areas for improvement, to attain desired student achievement.
6. Oversee student services, including health and safety services, counseling services, and extracurricular programs, and monitor for effectiveness.
7. Oversee a discipline management program and monitor for equity and effectiveness.
8. Encourage, oversee, and participate in activities for recognition of student efforts and accomplishments.
9. Oversee a program of staff development and monitor staff development for effectiveness in improving district performance.
10. Stay abreast of developments in educational leadership and administration.

duties under "District Management";[4] and seven additional duties under "Board and Community Relations." Under Board and Community Relations, the superintendent is required "[t]o maintain positive and professional working relationships with the Board and the community by" having the following duties:

1. Keep the Board informed of significant issues as they arise, using agreed upon criteria and procedures for information dissemination.
2. Respond in a timely and complete manner to Board requests for information that are consistent with Board policy and established procedures.
3. Provide recommendations and appropriate supporting materials to the Board on matters for Board decision.
4. Articulate and support Board policy and decisions to staff and community.

---

*WCISD Board Policy Manual, Policy BJA(Local): Superintendent Qualifications and Duties*, available at https://pol.tasb.org/Policy/Download/1211?filename=BJA(LOCAL).pdf.

[4] To demonstrate effective planning and management of District administration, finances, operations, and personnel, the Superintendent shall:

1. Implement and oversee a planning process that results in goals, targets, or priorities for all major areas of District operations, including facilities maintenance and operations, transportation, and food services.
2. Monitor effectiveness of District operations against appropriate benchmarks.
3. Oversee procedures to ensure effective and timely compliance with all legal obligations, reporting requirements, and policies.
4. Ensure that key planning activities within the District are coordinated and are consistent with Board policy and applicable law and that goals and results are communicated to staff, students, and the public as appropriate.
5. Oversee a budget development process that results in recommendations based on District priorities, available resources, and anticipated changes to district finances.
6. Oversee budget implementation to ensure appropriate expenditure of budgeted funds, to provide for clear and timely budget reports, and to monitor for effectiveness of the process.
7. Ensure that District investment strategies, risk management activities, and purchasing practices are sound, cost-effective, and consistent with District policy and law.
8. Maintain a system of internal controls to deter and monitor for fraud or financial impropriety in the District.
9. Ensure that the system for recruiting and selection results in personnel recommendations based on defined needs, goals, and priorities.
10. Organize District staff in a manner consistent with District priorities and resources and monitor administrative organization at all levels for effectiveness and efficiency.
11. Oversee a performance appraisal process for all staff that reinforces a standard of excellence and assesses deficiencies; ensure that results are used in planning for improvement.
12. Administer a compensation and benefits plan for employees based on clearly defined goals and priorities.
13. Encourage, oversee, and participate in staff recognition and support activities.
14. Oversee a program for staff retention and monitor for effectiveness.

*WCISD Board Policy Manual, Policy BJA(Local): Superintendent Qualifications and Duties*, available at https://pol.tasb.org/Policy/Download/1211?filename=BJA(LOCAL).pdf.

5. Direct a proactive program of internal and external communication at all levels designed to improve staff and community understanding and support of the District.

6. *Establish mechanisms for community and business involvement in the schools and encourage participation.*

7. Work with other governmental entities and community organizations to meet the needs of students and the community in a coordinated way.

*WCISD Board Policy Manual*, *Policy BJA(Local): Superintendent Qualifications and Duties*, available at https://pol.tasb.org/Policy/Download/1211?filename=BJA(LOCAL).pdf (emphasis added).

The summary judgment evidence in the record shows that the L.I.F.E. auction is held annually, and every year WCISD students from the Future Farmers of America ("FFA") program participate. WCISD students raise animals and show them at the L.I.F.E. auction. The L.I.F.E. auction at issue in the underlying case was held on March 2, 2019. Gonzalez testified in his deposition that six months prior to that auction, he talked to board members "about the prospect for funds coming in from AT&T to our Ag Science program." According to Gonzalez, there was "the groundbreaking of a wind energy program or project in which AT&T representatives participated and announced they were taking over the wind energy project and were willing to work with [WCISD] . . . student programs in general." "AT&T was the sponsor since they had purchased the project." Gonzalez was present at the event because he had been asked to attend; there were no board members present. Gonzalez testified that "at that event, the AT&T representative stated that they would look to support our Ag Science program through a foundation donation of the sort." According to Gonzalez, the AT&T national foundation director said to him, 'Hey, we'd love to send some funds your way.'" Gonzalez testified AT&T "pledged some amount of donation to the Ag Science program," "which includes windmill technology." Gonzalez testified that he did not recall the amount of the AT&T pledge but stated that it had nothing to do with the L.I.F.E. auction.

With regard to the L.I.F.E. auction, Gonzalez testified that he "remember[ed] responding to questions from Mr. Marshall about whether donations were going to come into the Ag Science program and whether we could leverage that or somehow petition and use that for some of the student projects." According to Gonzalez, Robert Marshall was "interested in getting money in to pay for the training boards for the Ag Science wind energy program." Later, Marshall asked Gonzalez, "Hey, maybe we can use some of that money for, you know—g[et] permission to use some of that [money] for the student projects, the animals at the fair." When asked whether Amy or Robert Marshall asked him to contact AT&T to raise money for the L.I.F.E. auction, Gonzalez replied that he was asked to see if AT&T would come through with its pledge. According to Gonzalez, Robert Marshall asked him, "Hey, any news from AT&T?" Gonzalez replied, "No. Let me ask again." Gonzalez clarified that the written petition he submitted was not only for funds for the L.I.F.E. auction but was also directed to funds for WCISD's Ag Science program. Gonzalez testified that when he spoke with the Marshalls over the telephone, "[g]enerally, the topic was 'Hey, you know, can you check to see if they're going to give us some money?'" Gonzalez replied, "Sure, I'll continue to check. I'll continue to press and see what I can do."

Gonzalez stated that he "remember[ed] sharing with [Mr. Marshall] that [Gonzalez] would make that [written] petition . . . to AT&T," "which ultimately . . . was denied." According to Gonzalez, when he inquired with AT&T, he was asked by the regional director of AT&T, Lydia Zapata, to "submit a petition on behalf of the district." Zapata told him that the AT&T budget "was tight during the legislative session" and that "their foundational monies were being directed towards lobbying and advocacy work with the legislative summit." But, she encouraged him to submit a request on behalf of WCISD that she would then submit. Gonzalez testified he was "merely, at the request of the board members, reaching out to [AT&T], reminding [AT&T] that they said that they were going to share some funds with us." Gonzalez's written proposal was

denied by AT&T. When asked if he ever, as a private individual, attempted to fundraise, Gonzalez replied, "No, sir. I don't have any relationships with anybody here outside of my superintendentcy [sic]."

In his deposition, Appellee Salvador Johnson testified he filed this lawsuit because he was under the impression that Gonzalez had talked to AT&T about contributing funds for the L.I.F.E. auction. He admitted that he never spoke with Gonzalez or anyone at AT&T. He explained his daughter was Amy Marshall, and they, as a family, had for the past fifteen years asked "certain people or certain companies to help us . . . with money to bid for some of the animals" at the L.I.F.E. auction. He testified his understanding of the agreement with AT&T came from his conversations with his daughter. At the auction, he placed a bid for "AT&T Wind Energy" in the amount of $10,476.44 and signed as an "authorized representative." When AT&T did not pay, Johnson paid $5,000 and his daughter, Amy, paid $5,476.44.

In response to Gonzalez's motion for summary judgment, Robert Marshall and Amy Marshall filed affidavits. They affirm in their affidavits that in mid-September 2018, they telephoned Gonzalez and asked if he would be willing to ask his friend at AT&T if AT&T would donate money for the projects at the L.I.F.E. auction. In mid-October, they called Gonzalez on speaker phone and asked if he had talked to his friend at AT&T about the L.I.F.E. auction. According to both affidavits, Gonzalez said he had talked to his friend at AT&T, and they agreed to donate $10,000 to $15,000.

The summary judgment evidence is undisputed that students from WCISD participated in the L.I.F.E. auction, and the money solicited from AT&T was to support their projects through FFA, which is a school-sponsored agricultural science program. It is also undisputed that Gonzalez met a representative from AT&T who expressed interest in AT&T donating money to WCISD to support WCISD students. The affidavits of Amy and Robert Marshall characterizing this AT&T

representative as Gonzalez's "friend" do not create a fact-issue regarding the substance of the conversation between Gonzalez and the AT&T representative. It is also undisputed that Gonzalez only spoke with Amy and Robert Marshall, WCISD Board Members, about the AT&T donation. All parties admit Gonzalez never spoke with Johnson, the person who made the bid at the auction, about the AT&T donation. Although the L.I.F.E. auction was not a school-sponsored event and fundraising is not a superintendent duty, we hold the summary judgment evidence shows that Gonzalez's actions, as alleged by the appellees, were *incident to* his duty to "[c]reate and support connections with community organizations to provide community-wide support for the high achievement of all district students," *see* TEX. EDUC. CODE § 11.1512(b), and his duty under the WCISD Board Policy Manual to "[e]stablish mechanisms for community and business involvement in the schools and encourage participation," *see WCISD Board Policy Manual*, *Policy BJA(Local): Superintendent Qualifications and Duties*, available at https://pol.tasb.org/Policy/Download/1211?filename=BJA(LOCAL).pdf. We emphasize that under section 22.0511's professional immunity provision, the alleged acts of the superintendent need only be *incident to* the scope of the superintendent's duties. *See* TEX. EDUC. CODE § 22.0511(a).[5]

Having held that section 22.0511's professional immunity provision applies, we note that the allegations in appellees' petition relate to claims for breach of an oral contract and promissory estoppel. The Legislature has not waived immunity for either of these claims. *See* TEX. LOC. GOV'T CODE §§ 271.151, 271.152 (waiving immunity for certain *written* contracts, not oral contracts);

---

[5] We note that section 22.0511 also requires the acts alleged by the professional employee of a school district to "involve[] the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students." TEX. EDUC. CODE § 22.0511(a). The summary judgment evidence is clear that the acts alleged by Gonzalez involve the exercise of his judgment or discretion. *See id*. Further, there is no evidence or allegation that any act of Gonzalez related to excessive force in the discipline of students or negligence resulting in bodily injury to students. *See id*.

*Gay v. City of Wichita Falls*, 457 S.W.3d 499, 507 (Tex. App.—El Paso 2014, no pet.) (explaining no waiver of immunity for breach of oral contract or promissory estoppel claims). Accordingly, section 22.0511's professional immunity provision bars appellees' breach of oral contract and promissory estoppel claims against Gonzalez.

Nonetheless, we note that appellees have specifically pled in their petition that they are suing Gonzalez only in his individual capacity and not his official capacity as superintendent. However, as explained above, appellees do not allege any facts illustrating that their claims are based on acts other than those incident to his duties as superintendent. *See Edinburg Consol. Indep. Sch. Dist. v. Smith*, No. 13-16-00253-CV, 2016 WL 3068119, at *9-*10 (Tex. App.—Corpus Christi-Edinburg 2016, no pet.); *see also* TEX. EDUC. CODE § 22.0511(a) (holding professional employee is not personally liable). Accordingly, their claims against Gonzalez in his individual capacity are also barred. *See Edinburg Consol. Indep. Sch. Dist.*, 2016 WL 3068119, at *9-*10.

## CONCLUSION

For the reasons stated above, we hold that the summary judgment evidence shows Gonzalez is entitled to the statutory immunity defense pursuant to section 22.0511 of the Texas Education Code. We therefore reverse the order of the trial court and render judgment that Salvador Johnson, Sr. and Amy Marshall take nothing from Heriberto D. Gonzalez. *See Lane v. Young*, No. 09-06-00260-CV, 2007 WL 63660, at *5 (Tex. App.—Beaumont 2007, no pet.) (reversing and rendering take-nothing judgment on the basis of section 22.0511 professional immunity defense); *see also Kobza v. Kutac*, 109 S.W.3d 89, 91 (Tex. App.—Austin 2003, pet. denied).

Liza A. Rodriguez, Justice